8    145
119   187

### HENRY PARISH, et al, *v.* MUNICIPALITY No. 2, et al.

On an exception that the petition discloses no cause of action, all the facts alleged must be taken as true, provided they are possible, but their legal consequence is presumed to be denied.

Servitudes are restraints on the free disposal and use of property, and are, on that account, not entitled to be viewed with favor by the law. Hence servitudes, claimed under titles, are never sustained by implication ; the title creating them must be express as to their nature and extent, as well as to the estate which owes them, and the estate to which they are due.

The servitude of view is sometimes considered in law as including the servitude of prospect, as well as that of light. But it may well be doubted whether a servitude of prospect can be established in our modern cities, where the houses are contiguous and no open space, save the streets and public squares, are habitually left, except, perhaps, in the case of adjoining lots. And if it can, the great inconvenience which would result from it, makes it the duty of Courts not to recognize it without an express constitution of it by title, in favor of buildings erected, or to be erected.

The right of perpetual front on the river is a new and unusual servitude, which, even if established by the title, would not be recognized ; and the authorization of the Legislature to sell a portion of the batture for building lots, is conclusive evidence that such servitude would have been against public policy. The same is true as to the servitude of prospect.

The Legisla ure has, at all times, a right to change the destination of public places.

The law defines servitudes to be charges imposed on an estate for the use and utility of another estate. They, accordingly, terminate when things are in such a situation that the servitudes can no longer be used. (EUSTIS, C. J.)

The legal principle of ownership involves that of exclusive dominion and the right of enjoying and disposing of property independent of others, and under the sole restraint of the law. Servitudes are created by the dismemberment of the absolute right of ownership, which thereby becomes modified and imperfect. (EUSTIS, C. J.)

The first presumption, presented by the fact of ownership, is clearly in favor of the absolute, perfect right, and no adverse right can be recognized, unless it results from presumptions which the law has established, or parties themselves have agreed as to its nature and purpose; and in this last case, the establishment of servitudes by covenant, certainty as to these relations, is a requisite essential to their validity. (EUSTIS, C. J.)

For the establishment of servitudes by the agreement of parties, they ought to be declared and described with certainty as to the property in favor of which they are created, as to the property subjected, and as to the nature of the charge imposed. (EUSTIS, C. J.)

When a stipulation exists in favor of a person, the owner of an estate, the language might be such, or the whole tenor of the act be such, that a servitude might be fairly deduced ; and in a case of that kind, reference ought to be had to the respective conditions of the estate, as affected by the servitude, in their locality, uses, convenience and value. (EUSTIS, C. J.)

Parties cannot be permitted to derive any advantage from vague and uncertain allegations, when they relate to matters defined in written instruments. The cause of action, the object of the demand, and the nature of the title, must be stated with such certainty as to apprise the defendant of every fact necessary to put him on his just defence. (EUSTIS, C. J.)

APPEAL from the Second District Court of New Orleans, *Lea*, J. *Benjamin & Micou*, for plaintiffs and appellants. *H. R. Denis*, for heirs of Gravier.

ROST, J. * The plaintiffs represent that they are the owners of lots fronting on New Levee Street, in that part of the city formerly called Faubourg St. Mary, and that they derived their titles from persons who, with the city of New Orleans, are made defendants in this suit.

That the title to those lots, and to the batture in front of them, was many years in litigation between their vendors and the City, until, to settle forever the rights of the conflicting claimants, on the 20th of September, 1820, they entered into a compromise, in which the following stipulations are found :

"Which said appearers on the first part, in their own names, and in their aforesaid capacities, and as possessors of the batture, in front of Suburb St.

---

\* SLIDELL, J., declined sitting.

19

Mary, or representing the said possessors, being desirous of favoring the public with the use of the bank of the river, in front of said batture, and of facilitating the communication of streets which run thereto, have, by these presents, made irrevocable donation *inter vivos*, and in the best form in which a donation may validate to the mayor, aldermen and inhabitants of New Orleans, represented by the Hon'ble *Joseph Roffignac*, Mayor of said city, here present, and accepting and stipulating for the said mayor, aldermen and inhabitants, &c., &c.

"The donation is made with the express condition, a condition without which it should not have been made, to wit: That all the grounds which are the objects of said donation, shall remain inalienable and not subject, or liable, to be seized for debt, or otherwise, in the hands of the corporation of New Orleans, who shall never, under any pretence whatever, sell, exchange, give, or otherwise dispose of them, in toto, or in any part, nor employ them for, or to any other use, than the one to which they are naturally destined to; nor shall there be made or erected on them any constructions or buildings, except, however, the case when the City Council shall think it convenient for general public interest to establish steam water works on any part of the batture hereby given, which said City Council shall think to choose for that purpose. It is, however, agreed that the prohibition of erecting buildings or constructions, shall not be construed so as to prevent the Mayor and City Council of New Orleans from establishing wharves, to facilitate commerce, when they shall deem it convenient."

The plaintiffs further allege, that in consideration of this abandonment, the defendants were to enjoy without molestation, as their own, all that portion of said front, lying and being between New Levee street and Tchoupitoulas street, the property now owned and possessed by said plaintiffs.

It is further alleged, that by the terms of said act, a real or prædial servitude in the nature of a servitude of passage, of view, and of perpetual front upon the river, was created upon the batture, in favor of the lots of the plaintiffs, which has passed to them and become their property, as an accessory to their lots.

That at the time of the division of the city, in 1836, the batture fell in the Second Municipality, and the reservations in the act of compromise then received the sanction and approval of the Legislature.

That a law has recently been passed authorizing the Second Municipality to compound with the original parties to the act of compromise, for the extinguishment of the servitude, and to sell a portion of said property, and that they are the only proper representatives of the parties to the act of compromise, and the only persons entitled by law to indemnity for the loss of said servitude. But that the defendants have set up a claim and pretensions to be the owners of said servitude, and to be entitled to indemnity for the extinction thereof, and that, thereupon, the Second Municipality has executed with them another act of compromise, giving them one third of the proceeds of that portion of the batture of which the Legislature has authorized the sale, in consideration of which they ratify the change of destination and renounce to all their rights to the remaining portion of the batture, and its future increase, in favor of the city.

That the servitude of which these parties have attempted to dispose, belongs to the petitioners, and is a right of property, of which they could not, under the Constitution, be deprived without just compensation being previously made.

That, to promote the interest of the City, they are willing to waive their rights to previous indemnity, and to consent to abide by the terms of the compromise last mentioned, provided it be made to inure to their benefit, and one third of the proceeds of the sale, it contemplates, be paid over to them.

They pray that they may be recognized as the owners of the servitude claimed.

That the City be decreed to pay over to them, one third of the proceeds of the lots authorized to be sold, as the price of said servitude, and that the other defendants be for ever prohibited and enjoined from claiming any right or title to the servitude aforesaid, or to any compensation or indemnity for the loss thereof, and from interfering with the aforesaid right of your petitioners.

The defendants excepted to the petition, on the ground, among others, that it discloses no cause of action against them. The plaintiffs have appealed from the judgment sustaining that exception.

If, in truth, the original proprietors of the batture have sold to the City the property of the plaintiffs, we can see no good reason why the plaintiffs should not be permitted to ratify the sale and claim the price. But the first question is—have the defendants disposed of property or rights which belonged to the plaintiffs? It is urged in their behalf, that on the trial of the exception, all the allegations in the petition are to be taken as true, and that it must, therefore, be assumed that the act of compromise, of 1820, created on the space in front of their lots, the servitude which they claim. The rule they invoke is to be understood in a more restricted sense. All the facts alleged must, on such an issue, be taken as true, provided they are possible in themselves, but their legal consequence is presumed to be denied. See *Shelmerdine* v. *Duffy*, 4 N. S. 38. The facts that the act of compromise, referred to, was passed, and that it contains the stipulation relied upon by the plaintiffs, must be taken as true, but whether that stipulation creates a servitude, is a question of law fairly at issue between the parties.

Servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law. In consequence of this, servitudes claimed under titles, are never sustained by implication—the title creating them must be express, as to their nature and extent, as well as to the estate which owes them, and the estate to which they are due. " It must, as near as possible, specify the nature of the servitude, limit it, and distinguish it, so that there may be no doubt as to its nature, and the use that can be made of it." A sale, in which it was stated, that the land sold was subject to a servitude, in favor of another estate, without specifying the servitude, has been held insufficient to establish it. See Lalaure, *Des Servitudes*, pages 46 and 50; Pardessus, *Traité des Servitudes*, p. —.

Is the servitude claimed expressly established by the act of compromise of 1820 ? That act is silent in relation to servitudes—it does not specify, limit or distinguish any, and mentions, in express terms, neither the estate that owes them nor the estate to which they are due. The only moving cause which it expresses for the donation it contains, is the desire of the grantors to favor the public with the use of the banks of the river, in front of the batture, and of facilitating the communication of streets which run thereto. This was the avowed object of the grant. It was a lawful object, and those who enjoy the doubtful advantage of having witnessed the contentions which preceded the

compromise, know, as a part of the history of the country, that the true and only object of this stipulation was to secure to the public, over this portion of the batture, the rights which it previously claimed and enjoyed over all the alluvion in front of Tchoupitoulas street.

To disregard the words of the instrument, therefore, for the purpose of establishing a servitude, by a remote and uncertain implication, would be alike a violation of truth and of law.

But what is the servitude claimed? The plaintiffs' counsel themselves are unable to define it with precision, and vaguely assert, that it is in the nature of a right of way, of view and of perpetual front, upon the river. So far as it is a right of way, or a right of view, the plaintiffs enjoy both by means of the street which separates their property from the batture, and of the continuation of those which extend to the river, over the batture. We agree fully with the authority cited from *Dalloz*, that the fact of having a door opening upon a street, constitutes a servitude on that street—in this sense, that if the destination of the street is changed, and it is adjudged by government to an individual, it remains subject to the servitude of passage. Dalloz, 1828, 1, 124. But the street has not been taken from the plaintiffs, and those servitudes, even if they were expressly established, would not extend beyond it. See *French* v. *Carrollton Railroad Company*, 2d Ann. page 80.

It is true that the servitude of view is sometimes considered, in law, as including the servitude of prospect, as well as that of light—but we greatly doubt whether a servitude of prospect can be established in our modern cities, where the houses are contiguous and no open spaces, save the streets and public squares, except, perhaps, in case of adjoining lots, are habitually left—and if it can, the great inconvenience which would result from it, makes it the duty of Courts not to recognize it, without an express constitution of it by title in favor of buildings, erected or to be erected. In 1820, the land now held by the plaintiffs, was a mere sand bank, and the intention to erect buildings upon it, is not mentioned in the act of compromise. "Urban servitudes include all those that are due to buildings, wherever situated." Lalaure, p. 14, par. 3d, tit. 31, law 1 and 2. *French* v. *Carrollton R. R. Co.*

The right of perpetual front upon the river, is a new and unusual servitude, which the title can, in no sense, be considered as establishing, and which we would deem it our duty not to recognize if it did. The change of the destination of the batture, and the authorization of the Legislature to sell a large portion of it for building lots, is conclusive evidence that such a servitude would have been against public policy. The same thing may be said of the servitude of prospect. Civil Code, 705.

To ascertain whether servitudes are contrary to public policy, regard must be had to the circumstances of the country and its wants. Thus, in all settled countries, where the land is all occupied, and few changes take place, it is held, that the use of a road, by the public, over a man's land for some years, creates a servitude of way. But we have held, that it would be against public policy to give the same legal effect to the use, by the public, of a path over the unenclosed and uncultivated lands of Louisiana, and that roads, thus used even for a long time, and recognized by the local authority, were not public roads, in the sense of the Civil Law. See the case of *Hatch* v. *Arnould*, 3d Ann. 482, and the case of [Name of the case omitted by the Court.—*Rep.*] not reported.

We are of opinion that the plaintiffs have failed to establish the servitude which they claim.

It has been asked, what the nature of the right, created by the compromise, was, if it was not the right of servitude ? We have already stated that the conditions appended to the nominal gift of the batture, amounted to a dedication of it to the public, to be used as an open space, and had no other object.

The defendants might, for purposes of public utility, thus deprive the city of the right of alienating the batture, or of erecting buildings upon it. But, as we held in the case of the *State of Louisiana* v. *The Executors of McDonough et al*, such a stipulation was at all times under the control of the Legislature, who could modify the effects of it and change the destination of the property whenever such a change became of public advantage. Its power to change the destination of it, was expressly recognized by us in the case of *Delabigarre* v. *The Second Municipality*, 3d Annual, 230.

The power of the Legislature to change the destination of public places, had been previously recognized in the case of *De Armas* v. *The Mayor et als*, 5 L. R. 174 and 194 ; *The Mayor et al.* v. *Hopkins*, 13 L. 351 ; *New Orleans* v. *The United States*, 10 Peters, 733 ; *Municipality No. 2*, v. *The Orleans Cotton Press*, 18 L. 122. These cases were all argued by the ablest counsel at the bar, and the opinions of the Court were prepared with uncommon care. In two of them, *Judge Martin* dissented on other points—but the Court was, in all the cases, unanimous in recognizing the power of the Legislature to change the destination of the quay and of the batture in front of the City of New Orleans. After so many solemn adjudications, the defendants do not appear to have had any serious claim which they could compromise. So that, whLe the act of 1820 was a compromise under the form of a donation, the act executed in 1851, would seem to be a donation, under the form of a compromise. The plaintiffs acquired no rights under that act, the gift not being intended for them. The Act passed by the Legislature in 1850, has been adduced by the defendants in support of some undefined right. It is our duty to give full effect to that Act, so far as it changes the destination of a portion of the batture, and authorizes the sale of it. But we deem it also our duty to disregard, as an assumption of judicial power unauthorized by the Constitution, whatever in it may be considered as recognizing, in the defendants, any legal rights under the compromise, after the change of destination of the property.

It is, therefore, ordered, adjudged and decreed, that the judgment of the Court below be affirmed, with costs.

EUSTIS, C. J. This suit is instituted by the plaintiffs, who are the owners of the lots fronting on New Levee street, in this city, for the recovery of one third of the proceeds of certain lots, situate on the batture in front of their property, recently sold under an Act of the Legislature. They claim it as the price of a servitude, which is alleged to have been created in favor of their property upon the property thus sold.

Exceptions were filed in the name of the heirs of *Bertrand Gravier*, against the joinder of the plaintiffs, and also against the joinder of the defendants in the same suit, to the petition, as not setting forth in a clear and definite manner the plaintiffs' cause of action, and to the petition as not showing any cause of action.

The District Judge decided on the last ground of exception, sustaining it and dismissing the plaintiffs' petition.

The plaintiffs have appealed, and the case has been argued on the correctness of this decision of the District Judge.

We should have preferred to have had the whole case before us, on all the evidence, but we are obliged to act upon it as presented, and must endeavor to ascertain whether, in law, the plaintiffs' action can be maintained on the allegations of their petition. It is to be supposed that they have made the most of their case, and that the allegations do not fall short of the facts.

The plaintiffs allege, that the defendants have sold a servitude exclusively belonging to them, and they claim the price.

The law defines servitudes to be charges imposed on an estate for the use and utility of another estate. They accordingly terminate when things are in such a situation that the servitudes can be no longer used.

The legal principle of ownership involves that of exclusive dominion, and the right of enjoying and disposing of property independent of others, and under the sole restraint of the law. Servitudes are created by a dismemberment of the absolute right of ownership, which thereby becomes modified and imperfect.

The first presumption presented by the fact of ownership, is clearly in favor of the absolute, perfect right, and no adverse right can be recognized, unless it results from the presumptions which the law has established, or parties themselves have agreed as to its nature and purpose—and in this last case of the establishment of servitudes by covenant, certainty as to these relations is a requisite essential to their validity.

The statement of the plaintiffs' case places it under the laws in force in this State previous to the adoption of the Code of 1825, and the repeal of the Spanish laws. The Code made great innovations upon the law of servitudes, as it existed in the law of Spain and the Code of 1808, but it is by these laws alone that the rights of the plaintiffs are to be tested.

They allege that they are the owners of the estates fronting on New Levee street, in favor of which the servitude is claimed, having derived title by regular and authentic acts, respectively from one or more of the original owners of the batture. That in 1820, a compromise was made between the owners of the batture and the city, claiming also title to the property by which the former should own in full property that portion situate between New Levee street and Tchoupitoulas street, and should abandon to the city, the land outside of New Levee street, on the bank of the river, with the right of alluvion, &c. : that the express condition of said abandonment and compromise was, that the space, or land, and its increase, thus abandoned, should never be sold by the city—that no buildings should be erected thereon, but that the same should remain open and unenclosed for all time : that by the terms of said act of compromise, a real, or predial servitude was created and imposed upon all the property existing and accruing by alluvions between New Levee street and the river, for the benefit of the property reserved by the proprietors fronting on said street : that said servitude was in the nature of a right of way, and of perpetual front upon the river, was of great advantage to the property, in favor of which it was established, and greatly enhanced the price thereof, and that the purchasers of the front lots gave additional prices in consequence of the same, and consequently, have paid the value of said servitude of way, of front and

of view, and are the owners of the same as well as of all other rights appertaining to said lots, which passed to them as an accessory, &c.: that this compromise received the sanction of the Legislature, but that subsequently a law was passed authorizing the parties to the act of compromise to extinguish this servitude and sell the property affected by it, and that accordingly the said property has been sold, under a certain other compromise, by which this servitude is undertaken to be extinguished—that to this second act of compromise the plaintiffs were not parties, though they, as owners of the lots to whom the servitude belongs, were the only representatives of the rights of the original owners.

This summary of the rights of the plaintiffs, as set forth in their petition, will enable us to test their claim to a share of the proceeds of the sale of this property, which is the object of the present suit.

Their right, it is said, is based upon the servitude which has been extinguished by the sale, and which formed a part of the property sold. They having affirmed the sale which was made without their consent, have a right to receive out of the proceeds a sum equivalent to the servitude, the abandonment of which completes the ownership, imperfect without it, which the purchasers have acquired under the sale.

The servitude, it is contended, is established by the following clauses in the act of compromise of the year 1820:

"Extracts from the Act of Compromise between the *City of New Orleans* and *Edward Livingston* et als., passed before *H. Lavergne*, Notary Public, on the 20th September, 1820.

"Which said appearers on the first part, in their own names and in their aforesaid capacities, and as possessors of the batture in front of the Suburbs St. Mary, or representing the said possessors, being desirous of favoring the public with the use of the bank of the river in front of said batture, and to facilitate the communication of streets which run thereto, have, by these presents, made irrevocable donation *inter vivos*, and in the best form in which a donation may validate to the Mayor, Aldermen and inhabitants of New Orleans, represented by the Honorable *Joseph Roffignac*, Mayor of said City, here present and accepting, and stipulating for the said Mayor, Aldermen and inhabitants.

"The donation is made with the express condition, a condition without which it should not have been made, to wit: That all the grounds which are the objects of said donations, shall remain *inalienable and not subject or liable to be seized for debt or otherwise*, in the hands of the corporation of New Orleans, who shall never, under any pretence whatever, sell, exchange, give, or otherwise dispose of them, in toto, or in part, nor employ them for, or to any other use, than the one to which they are naturally destined to; nor shall there be made or erected on them, any constructions or buildings, except, however, the case when the City Council shall think it convenient for general public interest to establish steam water-works on any part of the batture hereby given, which the said City Council shall think fit to choose for that purpose. It is, however, agreed, that the prohibition of erecting buildings or constructions, shall not be construed so as to prevent the Mayor and City Council of New Orleans from establishing wharves, to facilitate commerce, when they shall deem it convenient."

Concurring in the views taken by *Mr. Justice Rost*, on the plaintiffs' rights, I desire to refer to some rules by which Courts ought to be guided in the recognition of servitudes of the character of those claimed by the plaintiffs.*

The Code of 1825, not only introduced innovations in the law of servitudes, but, with great latitude, it recognized classes of servitudes entirely inapplicable to the state of our society and our habits, and which can have no place in a new and sparsely settled country. The Code Napoleon, from which they are taken, found this class of servitudes established by ancient customs and long usages, and had to deal with them as facts under rights acquired.

It is, therefore, not unimportant to have before us those principles which jurisprudence has established concerning the creation of those changes which threaten to complicate the rights of property, produce much embarrassment in the law itself, and little real benefit to the interests of society.

In the establishment of servitudes by the agreement of parties, they ought to be declared and described with certainty as to the property in favor of which they are created, as to the property subjected, and as to the nature of the charge imposed. The want of certainty as to either of these essential points is fatal to the stipulation, by reason of the impossibility of ascertaining the true meaning and intent of the parties. In cases where the word servitude, or an equivalent word, is used, and a real right is created on one estate in favor of another, difficulties as to the intention of parties can rarely arise. The substance of the act will determine its import. But when the stipulation is simply in favor of the person, owner of the estate, or when from the purport of the act itself, the right is merely personal, it then becomes the duty of Courts to determine on the legal effect of the agreement under consideration, according to established principles of jurisprudence in such cases.

It is a general rule in the interpretation of acts purporting to create servitudes by covenant, that the construction ought to be in favor of the right of perfect ownership of the estate sought to be subjected, and in the sense favorable to a free and exclusive enjoyment of the rights of property. A consequence of this rule is, that it is incumbent on the party asserting a servitude to establish it affirmatively.

When a stipulation exists in favor of a person, the owner of an estate, the language might be such, or the whole tenor of the act be such, that a servitude might be fairly deduced, and, in a case of that kind, reference ought to be had to the respective condition of the estates, as affected by the servitude in their locality, uses, convenience, and value.

Applying these rules to the servitude asserted in the plaintiffs petition, I think the conclusion is inevitable, that no such servitude can be predicated of the title under which they claim.

I find no apt words in the connection in which they stand, and in the sense in which they are used, creating a servitude. Neither that nor any equivalent term is used.

Nor can it be inferred that it was the intention of the parties to establish a servitude.

"The donation is made with the express condition, a condition, without which it should not have been made, to wit, &c." The parties have thus expressed what they intended, which was to establish as a *sine quâ non* condition to the validity and continuance of their stipulations, that the space in front

---

* Pardessus, *Treatise on Servitudes*, a work of great authority.

should be a public place, inalienable, and not liable to be seized—over which the Municipal government should not have the power which it has over ordinary public places. No buildings were to be erected on the space, except for steam water works. The public buildings which the former laws and usages of the land assigned to the banks of the river, such as markets, &c., were excluded from this space.

What the parties intended they certainly provided for, fully, clearly and specifically, and I find no ground for implying anything in this relation which was not provided for.

Had the owners of the riparian lots been few in number, and the lots sufficiently extensive for large dwelling houses, and the quarter of the city appropriate for private dwellings, there might have arisen some presumption of utility in favor of the servitude being created, notwithstanding the merely personal stipulation. But when we know the property to be at the great western landing, and exclusively used for stores and the appliances of the trade of the Western country, and was to be sold in small lots for stores, every such presumption stands repelled by the facts.

The original riparian owners were not proprietors in common. They each had a front on the river of so many feet, and there could be no use for the reservation of the servitude, either in their favor, or the purchasers of the lots which they acquired by the compromise, which should extend beyond each lot over the whole batture. The servitude claimed is indivisible, and its extinction would require the consent of all those in whose favor it was stipulated.

This fact was evidently foreseen, and as the increase of the alluvion was a matter of physical certainty in the course of time, and equally so the necessity for its being applied to the purposes of private ownership, the owners stipulated for their re-entry into their rights of property of the space they appropriated for the public use, in the event of the violation of the conditions before recited.

There does not appear to be any presumptions arising from the act itself, the nature or condition of the property in favor of the servitude asserted.

There is a total want of certainty as to the estates in whose favor the servitude is established. It is not stipulated in favor of the original riparian lots, nor the intermediate lots, between them and New Levee streets, nor the front lots owned by the plaintiffs.

It is not contended by the plaintiffs that the act of 1820 contains any other clauses relating to this matter, except those recited, and it is alleged that this right of the original owners passed by intermediate conveyances to the plaintiffs, as an accessory to their purchase of the front lots.

But that there is no presumption in favor of this ground, resulting from the situation of the plaintiffs' lots, fronting the river, or fronting a public place, and bounded by an intervening street, has been long since settled by the decisions of this Court, and our predecessors, after argument by the most eminent counsel. *Leverich et al*, ats. *The Mayor et al*, 13 Louisiana Rep. 330 ; *French v. The Carrollton Railroad*, 2 Annual Rep. 80 ; *Xigues v. Bujac et al*, 7 Annual Rep. p. —.

It has been urged in argument, that under the defendants' exceptions, every allegation of the petition must be taken as true, and that if the titles of the plaintiffs were in evidence, they might disclose a right of action, on their part, against the defendants.

20

We understand that the exceptions have the effect of a demurrer, and admit only facts positively stated in the petition, and not the conclusions of law drawn from relevant facts stated. The exception is to nothing but what thus appears on the face of the petition, and if it does not contain sufficient grounds for the relief asked, the exception is well taken and must be sustained.

When an action is founded on a notarial act, an authenticated copy must be annexed to the petition, in order that it may be communicated to the defendant if he desire it. Code, 174.

The plaintiffs, instead of following this direction, have stated their right, it is to be presumed, according to the purport of their titles.

We cannot permit parties to derive any advantage from vague and uncertain allegations, when they relate to matters defined in written instruments. The cause of action, the object of the demand, and the nature of the title, must be stated with such certainty as to apprize the defendant of every fact necessary to put him on his just defence, and no party can be allowed to secure any advantage from obscurity in this respect. *Perkins* v. *Potts*, 7th Annual Rep.

The defendants might have prayed oyer of the plaintiffs' titles and had them made of record. They did not so ask—but the first ·error, if there be any in this respect, was committed by the plaintiffs in not annexing copies of their titles to their petition.

*Benjamin & Micou* submitted the following argument, in support of a petition for a re-hearing.

The great importance of this cause, must be our excuse for again soliciting the attention of the Court, after the very full examination, which it has, no doubt, received.

We will consider, in turn, the leading objections made by the Court, to the claim of servitude set up in the petition, and, in doing so, will, for the present, regard the act of compromise as a part of the petition.

1. The objection that the terms of the act are not sufficiently explicit to show the establishment of a servitude.

We admit, without hesitation, that no servitude of the kind claimed by us can result from mere implication, and that there must be a title, to create a conventional servitude; on the other hand, no law has been cited, nor is it assumed by the Court that the use of the word *servitude* is sacramental, and that a servitude may not be created without its use. The question is one of construction, and the construction depends upon authority. What language is sufficient to establish such a right, can best be determined by collecting together the rules and examples under them; and this task we will proceed to perform.

The Code lays down certain rules of interpretation applicable to such cases.

First: That the presumption, in cases of doubt as to the existence of the right, is in favor of the owner of the property.

Second: That if the right be *stated* to be for the benefit of an estate, it is esteemed a servitude, though not so called.

Third: That if the right be not stated to be for the benefit of the estate, then it is the duty of the Court to inquire "whether the right granted be of real advantage to the estate, or merely of personal convenience to the owner."

Fourth: That "if the right granted be of a nature to assure a real advantage to an estate, it is to be presumed that such right is a real servitude, *although it may not be so styled, &c.*" Code A. A. 749, 750, 751, 752.

These are mere rules of interpretation, and were, no doubt, intended rather as declaratory of the law, than as an innovation upon the rules previously in use. They are not embraced in the Code Napoleon, and seem to have been the result of the jurisprudence of Courts, and of the general doctrine of treatises upon the subject. Let us, therefore, see what degree of particularity and certainty has been demanded by authors and Courts.

The writer who seems most exacting, with respect to the terms necessary to establish a servitude, and whose treatise is quoted by the Court, is *Lalaure ;* but let us see what *Merlin* says of him.

" *Lalaure,* livre 1, chap. 10, *dit, que quand on constitue une servitude, il faut que le terrain qu'on veut asservir, soit certain et désigné, tant par la mesure que par ses tenans et aboutissans. Il cite, à cette occasion, la loi 6, D. de Servituti- bus ; mais cette loi ne dit rien de semblable, quoiqu'il le suppose ainsi, dans la tra- duction qu'il en a donnée ; elle dit seulement qu'on peut établir ou remettre une servitude sur une certaine partie d'un fonds :* Ad certam partem fundi servi- tus tam remetti quam constitui potest ; *c'est-à-dire, qu'on peut la remettre ou l'établir sur une certaine partie comme sur la totalité.*"

" *Il suffit donc, pour la validité d'une servitude, que le fonds sur lequel on l'établit et l'espèce de la servitude soient désignés de manière à ne pas s'y mé- prendre, surtout dans les testamens, &c.*"    Merlin, 31, Rep. 64.

And this seems to conform to the general text of the Institutes. " *Si quis velit vicino aliquod jus constituere, pactionibus atque stipulationibus id effecere debet.*"    Inst. Just. L. 2, T. 3, § 4.    Thus giving permission to owners to estab- lish servitudes, as they grant any other right, by contract or stipulation without requiring any unusual particularity.

*Pothier* says, in general terms, that servitudes may be established, either by contract, or by donation, or will, and one of his instances is the case of a par- tition, where the share falling to one party is burthened with a servitude, in favor of the other portion of the property.    10 Pothier, p. 422.

*Toullier* says that servitudes are frequently established in partitions, where the right of view, passage, &c., is stipulated for the benefit of one and imposed upon the other of the houses : " *Dans tous les cas,*" he says, " *il importe de bien désigner le fonds auquel la servitude est imposée, et l'espèce de servitude, afin de prévenir les contestations trop fréquentes en cette matière.*    3 Toullier, No. 601.

*Duranton* says nothing about the precise form of establishing servitudes, but that they may be constituted in any form of contract, as sale, exchange, or covenant between neighbors, and most frequently in partitions : 5 Duranton, No. 562 ; and he says they may be proved by any title constituting or acknow- ledging them, " *ou bien un titre recognitif,*" emanating from the owner of the subject property or his author.    Ibid. No. 565.

*Zacharie* says, " *Si par suite des clauses d'une adjudication d'héritages ven- dues ou licités en justice, des servitudes sont imposées à ses héritages, elles ren- trent dans la classe des servitudes établies par convention.*"    2 Zacharie, 73.

*Marcadé* does not notice the form of acts necessary to constitute a servitude, but, in giving the rule for ascertaining whether a servitude has been created, he says, we must examine, first, if it is established between two estates, and se- cond, if in truth a charge is imposed upon one estate for the benefit of another. 2 Marcadé, 605.

*Domat* prescribes no special form for this contract, but says, the servitude is governed by the title which establishes it.    1 Domat, 329.

Thus the rules laid down in the Code are shown to be substantially the same that have always been observed in the Civil Law.    It could hardly be other- wise, for rules of interpretation of contracts are, in their nature, of universal application, and consequently do not differ very much in systems otherwise diverse.

Under the Common Law of England, no greater particularity is required. *Sugden* says, in substance, that if a covenant in a deed relate to the land, it passes with the land, and will be enforced, either at law or in equity, but gives no special form of words necessary to make such a covenant valid.    2 Sugden, Vend. p. 328 et seq.

In the case of the *Orleans Nav. Co.* v. *the Mayor,* 2 Mart. 33, *Judge Martin,* in his opinion, quotes the same text which we have copied above from the In- stitutes, *Si quis velit,* &c., as the law of this State.

We may thence conclude, that the rules of interpretation of contracts, con- stituting servitudes, were the same in substance before the Code of 1825, as were embodied in that Code, and that no particular terms or phrases were re- quired to establish such a right.

Let us now present only a few instances of the application of these rules to particular cases; and first, the case from *Dalloz*, which we have already brought to the attention of the Court.

The owner of a block of buildings sold a part of them to *Haudard*, stating in the act, that the land before, and at the end of the buildings sold, so far as the vendor had any right to it, was embraced in the sale, but that the purchaser should not build upon said land, unless at the end and in the same line with the other buildings. Having afterwards sold the remaining buildings to other persons, the original owner released this covenant in favor of the successors of the vendee in the first sale. They attempted to build upon the space reserved, and were prohibited by the successors of the vendees in the second sale. The Court of Cassation decided (although the word was not found in the deed) that the stipulation not to build, imported a servitude in favor of the buildings reserved from the first sale, which passed with those buildings to the purchasers in the second sale; that the covenant could not be released by the original owner after he had ceased to be the proprietor of the property to which the right attached. The injunction was, therefore, maintained. Dalloz, 1825, 1, 84.

Here, as in the present case, the servitude was created without the use of the word; it was held to attach to the property which, at the time it was made, belonged to the party; to have passed under the general term of rights, ways, and privileges, to the purchasers of that property. In that case, the same attempt was made that is made in this; that is, the original owner attempted to release the servitude after he had ceased to be the owner of the *terre dominante*, and it was decided that he had no such right.

But the case most precisely analogous to the present, is one decided by *Chancellor Walworth*, of New York.

*Bostwick*, the owner of a lot of land in the village of Auburn, was also the owner of a triangular piece of ground on the opposite side of the street. Having sold the first lot to *Miller*, it was agreed, as a part of the bargain, that the triangular piece of ground should be *deemed public property*, so that neither *Bostwick*, nor any person claiming under him, should ever erect any buildings, or exercise any other act of ownership thereon. Two deeds were prepared and executed, one simply conveying the lot sold, the other a bond, under a penalty, containing the above agreement respecting the triangle. Afterwards *Miller* sold to *Hills* a part of the property so purchased from *Bostwick*. The trustees of a church, having a front on the triangle, desiring to extend the church a few feet upon the ground, applied to the parties for permission to do so. The executors of *Bostwick*, the original owner, and the first purchaser, *Miller*, gave their permission, but *Hills*, the purchaser from *Miller*, refused. The trustees persisting in building, *Hills* enjoined.

Here is a case which, in every feature, corresponds with our own. There was the dedication to public use and the interposition of a street between the *terre dominante* and the *terre serviente*. There was no servitude or easement created by name; and while, in our case, the right in question appears in the title to the land, in the New York case it was evidenced by a distinct deed in the form of a personal covenant.

*Chancellor Walworth* decided: 1st. That the two deeds were to be regarded as one; thus connecting the right with the property to which it belonged; then proceeding to consider the nature of the right secured by the deed, he says: "The object of the bond was not to secure a personal right to *Miller* to have the triangle kept open, without reference to the benefit he expected to receive thereby as the owner of the lands conveyed to him by the deed. It was an easement or privilege annexed to those lands; and if he had reconveyed the whole of the land to *Bostwick*, his right to recover for a breach of the condition of the bond, would have become extinct. 3 Kent's *Comm.* 449; Ersk. *Princ.* 218, 227. The right thus granted was the servitude *non officiendi luminibus vel prospectui* of the Roman law, or the right of the owner of the lands to which it is appurtenant, to restrain the owner of the servient tenement from making any erection thereon which may injure the light or prospect of the dominant tenement, or any part thereof. Rights of this description, denominated predial servitudes in the civil law, and by our law termed easements, are attached to the estate and not to the person of the owner of the dominant tenement; and they follow that estate into the hands of the assignee thereof. So,

on the other hand, they are a charge upon the estate, or property of the servient tenement, and follow it into the hands of any person to whom such tenement, or any part thereof, is subsequently conveyed. 3 Kent's *Comm.* 420 ; *Code Nap.* art. 686 ; *Inst. Civil Law of Spain*, 139. As the right is annexed to the estate, for the benefit of which the easement, or servitude, is created, the right is not destroyed by a division of the estate to which it is appurtenant. And the owner, or assignee, of any portion of that estate may claim the right so far as it is applicable to his part of the property, provided the right can be enjoyed as to the separate parcels, without any additional charge, or burthen, to the proprietor of the servient tenement. The same principle is applied by the courts of law to covenants which run with the land. And the assignee of the whole estate, in a part of the premises, may recover in his own name, as such assignee, for a breach of the covenant as to that part, provided the covenant is in its nature divisible. Shep. Touchs. 199 ; *Conan* v. *Kemise*, Sir W. Jones's Rep. 245. In the language of a distinguished Common Law Judge, 'they stick so fast to the thing on which they wait, that they follow every particle of it.' See Wilmot's Opin. 346. As the right to have the triangular lot kept open for the benefit of the dominant tenement, was appurtenant to every part of the premises conveyed to *Miller* to which that privilege could be of any possible use, *Hills*, by the purchase of that portion of those premises which lies directly opposite the triangle, became, in equity at least, the assignee of that privilege or easement, *pro tanto*.

" *Miller* admits, in his answer, that he informed the complainant of the right he had secured, by the bond of *Bostwick*, to prevent the erection of any building on the triangular piece of land ; and that this information was given pending the negotiations for a sale to the complainant, as commending the purchase of that part of the premises which was subsequently bought by him. If the privilege was of no value to that part of the property, the mention of the fact of the bond would have been no commendation ; and if it was calculated to enhance the value of the property in the opinion of the purchaser, it would be inequitable to permit the seller to release the right he had secured by the bond, after he had, by that means, induced the complainant to become the buyer. If such a privilege did increase the value of the property, or render its possession more desirable, either in reference to its present or future use for village lots, the legal presumption is, that the purchaser took that privilege into the account in deciding upon the expediency of taking the property at the price he concluded to give. The complainant is, therefore, equitably entitled to the benefit of the stipulations in the bond, so far as is necessary to secure him the privilege, as appurtenant to that part of the premises. As against the present, or any future owners of the land, still held by *Miller*, the trustees of the Baptist church have secured the right to extend their building on to the triangle to the extent of twelve feet. But as they made that arrangement with the full knowledge of the equitable claim of *Hills*, they cannot, without his consent, be permitted to erect a building on any part of the triangle, to the injury of his part of the adjacent property, held under the deed from *Bostwick* to *Miller*.

" From the answer of the defendants, and from a view of the several localities about this triangle, as exhibited by the maps, I confess it appears to me that the complainant is a little unreasonable in refusing this privilege to a respectable congregation of christians, who wish to enlarge their church by extending it only a few feet into this vacant lot ; unless, indeed, the object of this suit is to settle his rights as to the future occupation of the residue of the triangle. But the same principle which would authorize this Court to disregard his rights for this object, would render it equally proper for the Court to disregard them if the object of the defendants was to erect a ' Hall of Science,' or a Turkish Mosque. And for aught I can know judicially, the contemplated building may be as offensive to the complainant as an edifice of either of the descriptions supposed would unquestionably be to his pious neighbors who now wish to worship there. However unreasonable I may suppose the complainant to be in this instance, if he has rights, they are guaranteed to him by the constitution, and he cannot be deprived of them, even for a public benefit, except by due course of law, and upon receiving a just compensation therefor. The Legislature has not deemed it expedient to authorize the taking of private property for such an object ; and until they do so, he cannot be deprived of his rights without his consent."

PARISH
v.
MUNICIPALITY,
ET AL.

This doctrine is strictly in accordance with that laid down in the case of the *Trustees of Watertown* v. *Cowen*, 4 Paige's Ch. Rep. 514, the circumstances of which were the same, except that the deed contained no dedication to public use. A similar covenant, not to build upon a public square, in front of premises sold, although not so named, was decided to be a privilege or easement which passed with the land to which it was attached. And the same doctrine is found in Sugden on *Vendors*. "There is no objection," says this author, "in point of law, to the owner of an area surrounded by houses, contracting that it shall never be built upon," and he maintains most decidedly that such covenants run with the estates, to which, and in favor of which they are attached, and will be enforced, both at law and in Equity. 2 Sugden on *Ven.* 329.

Perhaps we owe an apology to the Court, for again pressing these authorities upon its attention. Let it be found in the fact, that although they appear to be directly in point, they are not noticed in the opinions which have been pronounced, and we are left to conjecture to ascertain how they failed to produce any effect upon the mind of the Court.

We have thus labored to show, both by precept and example, that there is no peculiar rule of construction applicable to the establishment of servitudes. They are governed by the same rules with other contracts. The law pays no regard to mere names, because words are not things. It looks to the substance of the act, and if the meaning be apparent and lawful, effect is given to that meaning. In other words, we come back to the very rules contained in the Code of 1825. A servitude must have a title, therefore it is not presumed; but if a burthen is granted upon an estate, then the Court must look into the character of that burthen, and if it be in the nature of a servitude, and for the advantage of an adjoining estate, the Court has no power to declare the agreement null, but must enforce it as a servitude.

In the opinion of the Chief Justice, it is said, that the present case is to be governed by the laws in force prior to the new Code and the repeal of the Spanish laws, and that the Code of 1825 introduced innovations in the law of servitudes, and, with great latitude recognized classes of servitudes inapplicable to the state of our society and habits. But we are not informed in what particular this remark applies to our case. It is true that the chapter on servitudes was greatly elaborated in the Code of 1825, but we must venture to express a doubt, whether that Code allowed a greater extension of such rights than was allowed by the Code of 1808. The Art. 705, of the present Code, is the same with Art. 49, p. 138, of the Code of 1808, and is a translation of the corresponding Article in the Code Napoleon. It gives to proprietors the right to "establish on their estates, or in favor of their estates *such services as they deem proper;* provided, nevertheless, that the services be not imposed on the person, or in favor of the person, but only on an estate, or in favor of an estate, and provided, moreover, that said services imply nothing contrary to public order."

Whether there is anything in the servitude, now claimed by us, contrary to public order, is a question for consideration hereafter; but with this text of the Code in force ever since 1808, it seems difficult to maintain that any class of servitudes, permitted by the Code of 1825, were excluded by the law previously in force. But even if this class of servitudes be extended by the new Code, that extension cannot affect the validity of those which were recognized by both Codes. Of these, the servitude of not building, is one of the most prominent. It is a servitude well known to the Roman law and recognized and regulated in many texts. In the Code Napoleon, it is mentioned as an example of the kinds of servitudes that may be established by contract, No. 689, and the Art. 52, p. 138, of the Code of 1808, is only a translation of the corresponding article, and thus adopts the same example. The article is repeated without any change in the Code of 1825.

Let us now consider whether the principles of law, thus collected from the texts, and the decisions, are not applicable to the case before the Court; and for this purpose, we treat the act of 1820 as if it formed a part of our petition.

That act has been decided by your Honors, to be an act of compromise and partition. The whole property to which it referred was embraced between Tchoupitoulas street and the river, and was bounded above by Montgomery's line and below by Common street. A plan was annexed and referred to, in which the portion assigned to the City, and that reserved to the proprietors, is

distinctly marked—all between the Tchoupitoulas street and the Levee (excepting the cross streets) being reserved to the proprietors, and all between the Levee and the river being abandoned to the city.

It is impossible, therefore, to say that there is any uncertainty as to the estates upon which, and in favor of which, the alleged servitude was reserved; the two parts are as distinctly designated as they could be in an act of sale, and certainly a description sufficient to pass the absolute title, is sufficient to support the establishment of a servitude. If, therefore, in an act of partition, a service or burthen be imposed upon the share of one of the partakers, and if it be of a character to increase the value of the other share, it is a principle of law, which we have established beyond the possibility of doubt, that it is presumed to be a real servitude, although it be not so called.

The only question that remains, then, is, whether the character of the burthen is not such as to correspond with the legal definition of a servitude.

The abandonment of title by the front proprietors of all the property between the New Levee and the river, was made and accepted upon the express condition that the property should never be sold; that it should be kept open for public use, and that no buildings should ever be erected upon it. It is clear that this act gives the title or ownership to the city, and equally clear that it does not give the full and absolute enjoyment of the estate granted. The nature of the restrictions imposed by the act must, therefore, be considered.

The dedication to the public use, and the prohibition of sale, seem to us to be a mere inducement to the leading object of preventing improvements and buildings. If the space remained forever open and unimproved, the public would have the free use of it from its position on the margin of a great river. The prohibition of sale could have no other possible motive than to secure the perpetuity of the other conditions, because if those conditions were observed, it would be a matter of absolute indifference to the front proprietors, where the naked and barren title might vest. The three conditions, therefore, concur in one leading and prominent object, and that object is to keep open and unimproved, the space between the river and the estate, which the compromise secured to the front proprietors. So far from there being any repugnancy in these conditions, they are perfectly accordant with and auxiliary to each other.

The prominent burthen, thus imposed upon the estate accepted by the City, is the obligation not to build. Could such an obligation be of any possible benefit to the persons who demanded the stipulation, or their heirs, independently of any supposed advantage to the property, of which they were the owners? That it could not be, is a self-evident proposition, and it would be disrespectful to the Court to support it by argument.

Does not any advantage that might result from this prohibition inure to the property retained by the front proprietors?

As the Court seems to answer this question in the negative, we will consider the objections stated in the opinions pronounced.

The Chief Justice remarks, that the right of prospect, which the stipulation was calculated to secure, could only be of advantage to private dwellings, and as the property reserved was only adapted, from its position, to stores and shops suitable to the Western commerce, the servitude of view could be of no advantage to it.

We must first reply, that this objection travels beyond the limits of the demurrer, and negatives one of the facts alleged in the petition. To what purpose the lots reserved were, or are adapted, is not stated in the petition, and to assume that they are not suitable for private dwellings, is to go out of the record, and oppose the personal knowledge, or opinion, of the Judge to an allegation in the petition. It is charged in the petition, that the burthen imposed upon the batture, did increase the value of the front property, and that, in consequence thereof, the plaintiffs paid for it a much higher price than it would have commanded if the burthen had not been imposed. This is a fact—not a conclusion of law. It must, therefore, be admitted to be true on the demurrer. If it is not admitted, we must, according to all known rules of practice, have an opportunity of proving it.

But we join issue with the Court as to the correctness of the opinion thus expressed.

There are other considerations besides the mere pleasure of an agreeable and extensive prospect. The front on a wider street, or on a river, may add to the market value of stores, shops and warehouses. It affords to them greater facility of access, and, in the present case, insured a direct intercourse between each house that might be erected on the front, with each and every part of one of the most important public landings in the United States, and, perhaps, in the world. It enabled the tenants of these stores and warehouses, to attract their customers by exhibiting their signs, and showing the front of their establishments, so as to be visible from the floating hotels and floating warehouses, borne upon the bosom of the greatest of rivers, from the sea and from the country, with their freight of wealth, and their crowds of merchants and planters. The act of 1820 gave a promise, that this front and view should remain forever undisturbed, and gave an assurance to the occupants of front houses that no competitor should ever interpose his booth, or erect his stall, or his shop, between them and the landing place of the customer.

The increase of the money value of property, is as legitimate an object for the acquisition of the servitude of view, over an adjoining estate, as the mere pleasure of a prospect; and we think that no man can doubt that the stipulation, in the act, was intended to enhance, and did greatly enhance, the value of the front lots.

The Court refuses to recognize this advantage, because it is not expressed in the act as a condition or motive, and because another motive is expressed. That motive is the desire of "favoring the public with the use of the bank of the river."

To this we answer, in the first place, that it is an elementary principle of law, that the consideration of a contract need not be expressed on its face—Code 1888—and that the recital of a consideration which has no existence, will not affect the validity of the contract, provided there be another not expressed, and the true motive be not unlawful. *Pickersgill* v. *Brown,* 7 Annual; 6 Toullier. It follows, that the expression of one motive, whether truly or falsely, does not exclude the existence of another; and the Court is at liberty to search for the true object, in the whole tenor of the act, in the character of the stipulations, and even in circumstances not noticed in the act itself. Thus, in the case from *Dalloz,* 1825, already cited, no motive was expressed for the stipulation not to build, yet the Court found no difficulty in arriving at the conclusion that it was a stipulation for the benefit of that part of the property which the vendor retained for himself. In the case of *Hills* v. *Miller,* quoted above at large, the stipulation was contained in an ordinary penal bond, and, in form, was a mere personal obligation; but, to arrive at the true intent of the parties, the Court took notice of the deed of sale, executed on the same day, so as to sustain the stipulation contained in the bond, and find for it a lawful cause, in the advantage it conferred upon a neighboring property. There could be no better illustration of this familiar principle, that the decision of this Court in the case of *Delabigarre,* where your Honors held the motive expressed, and the form of the contract, a mere simulation; but yet held the act valid and effectual, because it contained lawful stipulations of a different character than those expressed. It was not a donation, which it pretended to be—yet it was a good compromise, which it did not purport to be.

Hence it is immaterial whether the motive expressed was true or false; but certainly the fierce litigation that had been carried on for twenty years between the public and the claimants of this property, would suggest the idea that the claimants were actuated by any other motive than disinterested generosity towards the public. The act bears, in all its features, the impress of a hard close bargain, in which each party was endeavoring to obtain for itself the best possible terms, and the thin disguise of the name, Donation, and of a desire to favor the public, conceals from no one its true character.

But let us give all reasonable credit to the front proprietors—let us admit that they were prompted by public spirit to dedicate the batture to public use. Still this is not the only apparent motive. If there had been nothing but generosity to the public, the gift would have been free and untrammelled. It would have been more liberal to let the public do as it pleased with its own. All parties, no doubt, anticipated that a time would come when, by the gradual receding of the river, room would be left for new ranges of squares and houses,

and it would have been more in consonance with pure generosity to leave to the public the privilege, at its discretion, hereafter to devote the space to private uses. Instead of this, we find a stipulation preventing forever the sale and change of destination, and prohibiting forever the improvement of the property.

In the case of *Delabigarre*, the Court make free use of the maxim that no one is presumed to give. The rule is founded in experience of human character and conduct. Men are not apt to be wholly liberal; their gifts are often made with a view to indirect profit. The usual motive to the dedication of streets and public places, is the enhanced value of the remaining property. The owners of the land on which the city of Washington now stands, abandoned about two-thirds of the soil to the government, or the public; but the munificence of the gift does not conceal the fact, that the remaining third acquired a value greater than the whole possessed before it was adopted as the site of a capital.

When we find the proprietors of 1820, binding in fetters, intended to be perpetual, the gift they were making to the public, can we be far from the truth in assuming that these fetters were coined in the mint of self-interest?

The Court objects to the servitude claimed, that it is of a new and unusual character; that the law recognizes no such servitude as the right of front to a river, and that the creation of new servitudes is not to be encouraged.

We respectfully submit that this confounds the advantage resulting from a servitude with the burthen which it imposes upon the subject estate. The servitude imposed is that of not building—*de non ædificandi*—one of the servitudes best known to the law, and the one selected by the Codes as an example. It is not left to inference, but is expressed in formal words. That servitude is always established in order that another and adjacent estate, the *terre dominante*, may enjoy a better light, or a better prospect. In naming the servitude, we distinguish between the two estates. If named with reference to one, it is the servitude *de non ædificandi*, with reference to the other, the servitude *ne luminibus officiatur*, or *ne prospectui offendatur*. § L. 8, T. 2. b. 15. The mention of either name includes the other, because there must be an estate to enjoy the prospect and another to be kept in such a condition as not to obstruct the view. If, from the natural position of the two estates, a servitude of this character happens to secure to the *terre dominante* a prospect of a river, that prospect is the result of the burthen imposed on the *terre serviente*. It may well be that the view of the river was the only reason for imposing the burthen of not building. We are not inventing a new servitude by claiming the right of front to the river, but are merely stating the advantage which one of the most familiar servitudes confers upon the property of the plaintiffs.

In one of the opinions it is said, that at the time of the compromise in 1820, the land, now owned by the plaintiffs, was a mere sand bank, and the intention to erect buildings upon it, is not mentioned in the act, and then quotes *Lalaure* that, "urban servitudes include all those that are due to buildings wherever situated."

Are we to understand from this that urban servitudes cannot be stipulated, without stating in the act, that buildings are to be erected to enjoy it? It would seem that the situation of the property, in the centre of a city, would sufficiently show that buildings are to be erected upon it. The stipulation, therefore, implies that buildings are to be erected, the tenants of which may enjoy the servitude. The fact that the servitude *may* be of benefit to buildings afterwards erected, adds to the value of the property for whose use it is stipulated, and therefore is a legitimate motive for the stipulation. In the opinion of *Chan. Walworth*, quoted above, it is so stated, and we cannot believe that the Court differs from him on this point.

But in this, as in many other instances, we submit, that the Court is travelling beyond the demurrer. If the Court intends to draw any conclusion from the condition of the property in 1820, its condition ought to be proved, not assumed from the recollection of the Judge. There is no allegation in the petition touching the condition of the property, and in a demurrer nothing can be considered beyond the petition.

It would seem, then, that every requisite of the law has been complied with in the manner of creating this servitude. The law requires only that degree of particularity that is used in other contracts. In the present case there is no

21

ambiguity in the language imposing the servitude, or describing the estate upon which it is imposed. The servitude is that of never building; the property is that embraced between the Levee and the river, bounded above by Montgomery's line, and below by Common street. All this is expressed in the deed, in language too plain to admit of construction or interpretation. The only question in the cause is, for whose benefit was this burthen imposed? Was it for the personal convenience of the original proprietors? or was it for the purpose of adding to the value of the adjacent property which they retained? This is a question of construction. How does the law answer it? What did the Court of Cassation say in the case of *Haudard?* What did *Chancellor Walworth* say in the case of *Hills?* What does *Sugden* say? What does the Code say with regard to the interpretation of such stipulations? All join in the common answer—if the burthen imposed be of a nature to confer a benefit upon the neighboring estate, it is a præial servitude.

Let us add to this a single reflection. That the stipulation, never to build, was a serious burthen upon this property, none will dispute. If that burthen was imposed for the benefit of the adjacent property, it is valid—if for the personal convenience, or to gratify the fancy of the front proprietors, without any profit to their estates, it is invalid and null. Our construction gives effect to the language of the contract, that of the Court annuls it.

II. The objection that the servitude claimed is against public policy.

If the servitude is not created by the terms of the compromise, it is hardly necessary to inquire whether, if created, it would be contrary to public policy. The use of the latter argument would be supererogatory. Yet, as the Court has thought proper to make the objection, it is our duty to consider it.

In the opinion of *Mr. Justice Rost*, the objection is thus stated—"It is true that the servitude of view is sometimes considered in law as including the servitude of prospect, as well as that of light; but we greatly doubt whether a servitude of prospect can be established in our modern cities, where the houses are contiguous, and no open spaces, save the streets and public squares, are habitually left, except, perhaps, in case of adjoining lots; and if it can, the great inconvenience which would result from it, makes it the duty of Courts not to recognize it, without an express constitution of it, by title, in favor of buildings erected, or to be erected."

His Honor recognizes the existence of a servitude, or a right so like it, as to amount to the same thing, over the public streets in favor of the lots fronting on them. He says he agrees with *Dalloz* in the opinion, that if the Sovereign sell the street, the buyer cannot use it so as to deprive the front proprietors of the right of way. If then this servitude may exist, by implication, over the streets, may it not be established, by express contract, over a public square? We yield to the cases already decided, that no such servitude will be held to extend beyond a street, by mere inference; but if it be so expressed in the deed, is there any policy of law which forbids the extension of the servitude of prospect over a public square? So long as it remains public, the prospect is enjoyed without any stipulation. Is it possible to contend that it is against public policy to stipulate for the continued enjoyment of that which is constantly enjoyed without stipulation? The city of New York, and most other cities in the world, afford numerous instances of public squares, or parks, kept open for the avowed purpose of affording a better prospect to the surrounding houses; and so kept open by express covenant with the proprietors of those houses.

If a public square can thus be consecrated to the special use of the surrounding property, why may not the margin of a great river be kept open for the peculiar benefit of the property near it? Public squares and wide open walks on the margin of rivers, or of the ports of cities, have always been regarded as public benefits. If not indispensable for the health of the inhabitants, they contribute, in an eminent degree, to their comfort and pleasures. The mere dedication of such places to public use, leaves the change of that dedication subject to the legislative or municipal will. So your Honors have decided, and we accept the decision as the proper interpretation of the law. But if, in addition to the public dedication, private rights be granted, tending to secure the perpetuation of a public convenience, those rights cannot be held to conflict with public policy. We have already brought to the attention of the Court numerous authorities from the French books, showing that private servitudes

may be established over public places, provided they are, in their nature, consistent with the public use for which the property is principally intended. 3 Toullier, § 478, 481, 482, 483 ; 2 Zach. 72 ; 5 Duranton, § 297, 298; 12 Dalloz, *Jur. Gen.* 10 ; Dalloz, 1828, 1, 124; Dalloz, 1830, 2, 25; and the Court has assented to the proposition in the case of streets. What distinction can be made between streets and squares ? And what distinction between squares and the banks of rivers ? In either case the servitude claimed is in aid of a public advantage, because its existence renders it more difficult to put an end to the advantage secured to the public. The stipulation of such a servitude, so far from being repugnant to the public use, is in aid of the main object of the dedication, and is, therefore, eminently entitled to favor.

But, in the present case, we submit that the question of policy has been decided by a higher power than the judicial. The act of 1820 tenders the use of this property to the public, but couples it with the express condition, without which the dedication would not have been made, that its destination should never be changed, and that the property should never be covered with buildings. The Legislature, in 1836, accepted this offer in the most formal terms. It declared, that no use should ever be made of the Batture inconsistent with the terms of the compromise. It, therefore, adopted the terms of that instrument, and gave them the sanction of a law.

Can the Court decide that a law is impolitic, and refuse, for that reason, to enforce it ? The law itself says this cannot be done. The distinction between odious laws and those entitled to favor, is abolished, and judges are prohibited from departing from the plain letter of a statute to find its supposed policy. These texts seem, to us, to place it beyond the power of Courts to object to the *policy* of things which the Legislature has sanctioned. The legislative sanction makes them a part of the law, and judges must respect them as such.

A text of the Partidas enumerates, among those things which could not be burdened with servitudes, public places, sacred property, &c. If, while this law was in force, a dedication were made to the public of a property, with the reservation of a private servitude, the dedication would require the special acceptance of the sovereign, before it would become binding on the donor. If the sovereign accepted, the same power which enacted the law would permit an exception to it. If the sovereign refused to accept, the right of property would revert to the donor. This seems to be the plain view of the subject, and is more consistent with justice and fair dealing than to say that in such a case the sovereign would accept the dedication and annul the condition. The sovereign will is represented, in the case now before the Court, by the Legislature and by the Municipal Councils. The latter gave their consent to the terms of the compromise by becoming parties to the act; the former by adopting and enacting its stipulations into a law, in 1836.

III. The control of the Legislature over public places.

The general proposition that the Legislature has power to change the destination of public places, we have again and again admitted; but like all other general propositions, it has its exceptions. The exception, claimed in this case, is, that if the change of destination cannot be made without violating private rights, then the power, even of the sovereign, is insufficient, without compensation to make such change. This exception is recognized in the very authorities quoted by your Honors, in support of the general rule. In the case of *De Armas* v. *The Mayor*, 5 La. Rep, *Judge Martin* does not even concede the general proposition. He considers the point in pages 158 et seq., of the Reports, and concludes that such places are inalienable. On page 170, he says : "Upon the whole, it appears to me that the appellees' counsel has failed to establish any of the propositions he relied on, which have any bearing in this case, viz :

"I. That the space marked on the plan is not a quay.

"II. That the King of Spain could alienate public places, &c."

This opinion, although a dissenting one, is the most lauded of all those pronounced by this eminent Judge. Your Honors gave it your sanction in the case of *Hopkins*, 13 La. 330, and it has already been adopted by the Supreme Court of the United States, in the case of the *City of New Orleans*, 10 Peters, 723.

It is true that *Judge Martin* held, that the place in question being a part of the *Quai*, "could not be claimed by an individual in a civil action," but he

PARISH
v.
MUNICIPALITY,
ET AL.

came to that conclusion because the place was *hors de commerce*, and could not be alienated, even by the King.

But the point is more critically examined and the distinction more clearly laid down in the case of *New Orleans*, in 10th Peters. *Mr. Justice McLean*, after quoting the opinion of *Judge Martin*, proceeds, p. 723. "The power of appropriating private property to public purposes is an incident of sovereignty. And it may be, that by the exercise of this power under extraordinary emergencies, property which had been dedicated to public use, but the enjoyment of which was principally limited to a local community, might be taken for higher and national purposes, and disposed of on the same principles which subject private property to be taken.

"In a government of limited and specified powers like ours, such a power can be exercised only in the mode provided by law; but in an arbitrary government, the will of the sovereign supersedes all rule on the subject."

After quoting the Spanish laws, the Judge proceeds, p. 726: "A faithful observance of these laws would have preserved the rights of the City, as to the common, free from invasion. No law was cited in the argument which showed the power of the king of Spain to alienate land which had been dedicated to the public use; and it is clear that the exercise of such a power would have violated the public law, which is understood to have limited the exercise of the sovereign power in this respect.

"The king of Spain, like the king of France, had the power to give permission to construct buildings on grounds dedicated to public use, without injury to the public rights; but this does not show that either sovereign had the power to alien such lands."

P. 730. "There can be no difference, in principle, between ground dedicated as a quay to public use, and the streets and alleys of a town: and as to the streets, it may be asked, whether the king could rightfully have granted them. This will not be pretended by any one. And it is believed, that the public right to a common, is equally beyond the power of the sovereign to grant; unless he dispose of it under the power to appropriate property to the national use; and then compensation must be paid."

Here we are led to a clear understanding of the proposition. A city may acquire a right to a common, a quay, or a street, which the sovereign cannot destroy, because the property is *hors de commerce*. In such case the joint assent of the city and of the sovereign is necessary to a change of destination. Why is it necessary? The reason obviously is, that in addition to those general rights, which the whole world may exercise over the property, the city has a peculiar and special interest, over which the law throws the shield of its protection. But if an individual have the like special rights over public property, why does not the same rule apply. If, for instance, the owners of dwellings fronting on the celebrated Boston Commons, are assured by their titles, emanating from the original owner of the soil, that their property shall forever enjoy the prospect over the Common, it is obvious that they possess a peculiar and special interest, in addition to the rights which all others possess. The stranger may walk through the Park, the surrounding proprietors enjoy its view, while sitting at their firesides, and the value of their estates is greatly enhanced by this privilege. Their right is, therefore, as sacred as the right of the City contradistinguished from the State, and can, no more than the rights of the State, be divested without compensation.

*Judge Martin*, in his opinion already quoted (171), gives instances of the legitimate exercise of the sovereign power. "I do not," he says, "wish to be understood to say that natural, or other events, may not render a public place no longer susceptible of the use for which it was dedicated; nor that, when this is the case, it does not lose the legal character which the dedication and consequent use had given it." He then cites the case of the town of Aigues-Mortes, which had ceased to be a sea-port by the receding of the sea from its walls, and of the town of Bath, on Tar river, which being destroyed by conflagration, *all the lots were re-purchased* by the original owner, and the legislature *then* repealed the act making it a town. In the first case, the use of the port had ceased from a natural event. In the second, *there was no longer any private right* to interfere with the change of destination. The original owner, who had once sold a part of the lots, had repurchased them all; there was conse-

quently no public to enjoy the property, and no private right whatever was violated by the legislative permission to reduce it once more to the condition of a plantation.

These examples are instructive. They lead us to the true principle governing the case. In no government of laws can private property be taken for public use without compensation. If either individuals, or a limited community, have lawfully acquired a special servitude upon a public place, their rights could no more be divested, without compensation, than could individuals be turned out of their houses to create a public place, without indemnity. The right to enjoy the prospect over a public square is a property, as well defined and as clearly recognized as the title to the tenement from the windows of which the view is enjoyed, and both come under the sacred cover of the law.

The true proposition to be deduced from the cases cited by the Court, in our humble opinion, is not that the sovereign has an unlimited and arbitrary right to change the destination of public places, but that such change of destination cannot take place without the sanction of the sovereign. To the public the use has been granted; consequently that use cannot be divested without the consent of the public to which it belongs, and the public gives its assent by the expression of the sovereign will. So if a city has acquired a special right, in addition to that of the public, the city must also consent; and if an individual have a like right, his consent is necessary. This is the true theory, and is the only one that can properly be deduced from the very celebrated cases quoted by the Court.

Over the rights of local communities, and of individuals, the right of expropriation in due course of law, and upon indemnity being paid, presides as a conservative attribute, which does not destroy the right of the citizen, but makes it subservient, upon equitable terms, to the public weal. To this right *Chancellor Walworth* referred in his opinion ; to this the French Courts, in the numerous cases to which we have heretofore called the attention of your honors, refer; and your honors have yourselves recognized its application to the case of streets. Why, then, does it not apply to the case of any other public space, over which surrounding houses have a view, or to an open mall on the bank of a river ?

Lest we be misunderstood, we repeat, that we do not question the ruling of the Court in the case of *Hopkins*, or in the case of *Annunciation Square*. In both these cases it was decided that the parties claiming servitudes had no title ; or in other words, that the mere fact of having a front commanding a view of a square or quay, did not create a servitude. But if *Livaudais* had inserted in the title of the proprietors, whose lots fronted the square, an express agreement that it should never be used for any other purpose than a public and open place, it would be a libel upon the intelligence of your honors to say that you would have permitted even the legislature to divest this servitude without indemnity.

If there be no private servitude over the public place, there is no right to be compensated, and the subject falls under the absolute discretion of the sovereign, because the sovereign is the only representative of the public ; but when such servitudes had a lawful existence, even the kings of France and Spain respected them. Still more sacred will they be held in a constitutional government, where the higher law is placed above and beyond even legislative power. This principle was found in the Code of 1808, and was incorporated in the constitution of 1845 and 1852, as well as in the Code of 1825.

The inference which one of your honors seems to deduce from the power of the sovereign to change the destination of public places, which is asserted as if existing without limit or qualification, is, that the reservation of the conditions in the act of 1820 was a mere nullity. His Honor assumes that it would have been competent for the Legislature to have accepted the act on the day after it was passed, and on the next day to have annulled and set aside the conditions which formed the inducement and the consideration of the grant. If it be admitted that the act of 1820 was a contract, to which the State acceded, such a result could not ensue. Even governments are bound by their contracts, and especially in our Union are the States so bound. The great compact, which by common consent, the whole people of the United States have adopted, and which is placed beyond either legislative or congressional control, prohibits all

laws impairing the obligation of contracts. It is true that the observance of contracts by States cannot be compelled by judicial power, because that would be to array the Courts and officers against the government which created them. But the public faith and national honor are the guardians of State contracts, and the government which refuses to perform its own contracts brings upon it the scorn of mankind.

The acceptance of the act of 1820 is a contract, by which the faith of the State was pledged to the observance of the terms and conditions contained in that act. It is true that the accepting act does not appear in the shape of an express contract; but it is found in the amended charter of the City, which was one of the parties to the act of 1820, and prohibits the City from ever attempting to violate the conditions on which it had accepted the batture.

If this be regarded as an acceptance by the State, of the dedication tendered by the act, there is an acceptance upon the conditions expressed; if it is not an acceptance, then the rights of the public have never attached to the property; they are inchoate merely, and the necessary consequence of annulling the conditions would be to refuse the dedication that is tendered in the act. The agreement was either null *in toto*, or wholly good. There is no middle course, consistent either with law or good faith; both forbid the State to accept so much of the act as is supposed to be beneficial, and discard all that it contains tending to create a burthen.

Nor has the State ever claimed or attempted to exercise any such power. The course of legislation on the subject shows that the State is unwilling to attempt a course so contrary to every sentiment of justice and of honor. In the act of 1850, no absolute power is given to the city to violate the compromise which the Legislature had ratified in 1836. The language of the law is, that in the event of an agreement between the original proprietors and the city, the property may be sold. Here the right of the proprietors to indemnity, when their property is to be taken for public purposes, is distinctly recognized, for the legislative permission is granted only on the condition of an agreement; and a new contract, of course, involves the idea of a compensation.

We lay no stress upon this action of the Legislature as an authority upon the point of law involved in this case. On the contrary, we conceive that the Legislature committed an error in naming the parties to whom compensation was due. But we regard the act as a legislative acknowledgment that compensation was due to somebody; and this acknowledgment is not to be regarded as a judicial interpretation, but as the confession of one of the parties in interest. The dedication to the public, which is represented by the sovereign, makes the sovereign a party to the contract. In the interpretation of contracts, whenever there is a doubt as to the meaning of the language, the Code itself declares that "the construction put upon it, by the manner in which it has been executed by both, or by one, with the express or implied assent of the other, furnishes a rule of interpretation." Code, 1951.

One of your Honors intimates that the act of the Legislature and the agreement, executed under it, was a donation, instead of a compromise which it purported to be. We have already had occasion to refer to the maxim, that gifts are not to be presumed—and when we recollect, that at the date in question, the City seemed to be on the very verge of bankruptcy, and executions were constantly issued against its property—is it not too violent a presumption that the authorities meant to give away several hundred thousand dollars, without any consideration whatever? But we presume that even his honor does not mean that the State and City intended to make so liberal a present. The idea must be that they acted under a false view of the rights of the proprietors. If so, it is not a donation, but the contract was made in error.

Whatever may be the view of the Court on this point, we have the plain fact before us, that to the contract of 1820, there were but three parties—the front proprietors, the City and the State—and that all of these parties have concurred, in the most solemn and deliberate form, in treating the conditions of the contract as valid, and in bargaining, giving and receiving upon that hypothesis. Hence, in the interpretation of the contract, we must regard this common action as entitled to some weight.

The position for which we contend, gives effect to every part of the act, and leads to no conclusion that seems unequal or unjust. If the position of the

Court be correct, and the conditions imposed had no binding effect whatever, then all parties were mistaken, and the only conclusion, consistent with justice and fair dealing, would be that the whole agreement would be void for error.

If, on the other hand, the City is invested with the title, the public with the use, and the front proprietors with the servitude, there is no error and no injustice; the stipulations all harmonize, and form mutual considerations, the one for the other, and the contract is in full force in the manner in which the parties understood it, when it was signed and accepted.

It would seem from the opinion pronounced by the Chief Justice, that he does not concur in this part of the opinion of *Mr. Justice Rost.* The Chief Justice says, " as the increase of the alluvion was a matter of physical certainty in the course of time, and equally so the necessity for its being applied to the purposes of private ownership, the owners stipulated for their re-entry into their rights of property of the space they appropriated for the public use, in the event of the violation of the conditions before recited."

We cannot presume that his Honor means that there is an *express* stipulation of re-entry in the act. He is too familiar with its terms, not to know that no such words exist in the contract; he, therefore, only intends to state what he understands to be the legal effect of a violation of the conditions imposed.

If such be the effect of their violation, it is obvious that the conditions are not void. On the contrary, a degree of validity and binding force is attributed to them far beyond that for which we contend. It would seem, therefore, that we hold a position between extreme opinions of two members of the Court, one of whom holds the conditions absolutely null, and the other considers them as so binding, that their violation would confer again upon the proprietors the ownership of which they divested themselves in 1820.

We cannot, however, imagine that such is the deliberate opinion of his Honor. To give to the conditions such an effect, is to invest the act of 1820 with that incident most characteristic of and peculiar to donations. But as both your Honors declared in *Delabigarre's* case, that the act was not a donation, we cannot suppose that any change in your opinion has occurred on that point.

We, therefore, respectfully submit, that the Court has erred in refusing to give to this act the interpretation for which we contend, and that its legal effect is precisely that which its stipulations, though not its name, express. In form it is a donation, in substance a compromise. It purports to give the title of the batture to the City, the use to the public, and it burthens it with the condition of not building. There is nothing illegal in its stipulations. It expresses the intention of the parties and ought to be executed according to that intention.

IV. The propriety of deciding the question of servitude *vel non,* on the demurrer.

We have reserved this for the last, because we desired to present more fully than before our views in support of the existence of a servitude; but we still respectfully contend that the Court has erred in undertaking to decide the question on the demurrer.

The Chief Justice quotes the Code of Practice to the effect that, a party whose action is founded upon a notarial act, must annex a copy, in order "that it may be communicated to the defendant, if he require it;" he then admits, that if the plaintiff fail to do so, the proper course of the defendant is by exception to compel the plaintiff to comply with the provision of the Code; but says, although this was not done, the first error was committed by the plaintiff, and the Court is, therefore, at liberty to look into the act as if it had been annexed and made a part of the petition. We submit that this provision of the Code of Practice has no application to the case. An action founded upon a notarial, or public act, means an action for the enforcement of a contract, not for the assertion of a right of property. In a petitory suit, the plaintiff is bound to disclose his title, but was it ever heard that he was required to file the whole chain of title in court with his petition? Although on the trial of the cause these titles must be adduced in support of his demand, yet it cannot be said that his action is founded upon them; and, in such actions, we hazard little in saying, that the common understanding and practice of the Bar has been, that it was not necessary to file the titles.

The value of a servitude is the object of the plaintiffs' demand; they have stated how and whence it is derived, and they seek to obtain a compensation for

it, by adopting a contract to which they were not parties. If we were bound to file copies of these acts, then the defendants have waived the right to insist upon their production, by joining issue on the face of the petition. That is the only issue before the Court. The act of compromise is not in the record. It was referred to in the argument, but this does not add it to the record; and not being there, your Honors cannot judicially know its contents. If, therefore, to give effect to the demurrer, the compromise must be tacked on to the petition, the Court has no power to bring it into the record, and the demurrer must be overruled. Still less does its absence from the record afford any just ground for reflections upon the regularity of the proceedings of the plaintiff, or justify any presumptions against their cause. If there is error, or irregularity, it is a common error, and this Court can only entertain the issue as the pleadings present it.

We also submit, that, in order to support the demurrer, the Court has gone out of the record in other matters, which we have already incidentally noticed. The personal knowledge of the Judges has been, in several instances, either opposed, or added to the allegations of the petition. From the fact that this has been done, we must infer that these considerations had some effect upon the conclusion to which the Court arrived. But we submit that they ought not to have been regarded, and that the demurrer should be considered purely and simply upon the charges made in the petition.

If any rights, no matter of what character, were reserved by the original proprietors—whether of servitude or of reversion as donors—those rights were susceptible of alienation. The plaintiffs allege that those rights have been transferred to them, and yet the Court undertakes to say, without looking into their titles, that they have not been transferred.

The rule of decision on demurrers is thus laid down in Daniels *Chan. Prac.* p. 599 : " A demurrer will lie whenever it is clear that, taking the charges in the bill to be true, the bill would be dismissed at the hearing; but it must be founded on this, that it is an absolute, certain, and clear proposition that it would be so." This is unquestionably the principle that should govern the action of your Honors on this demurrer. No presumptions are admitted in favor of the demurrer, because it is a harsh remedy, and justice is generally better subserved by hearing the evidence. And yet, in this, it seems that every presumption is taken in favor of the demurrer and against the petition. It is, therefore, our duty to submit the grave questions involved, once more to the attention of the Court, and, even should it prove to be without result, this duty is now performed.

EUSTIS, C. J. We have examined and considered the argument of the counsel in favor of a rehearing of this cause. Although more elaborated than that of the learned counsel on which judgment was rendered, we find nothing in it, in point of fact, which has not been already passed in review by the Court.

From the notoriety attendant on all suits relating to the batture, we have given to this cause more of our time than the question it involved required. Separate opinions were delivered by two of the Judges concurring in their result, and nothing has resulted from our inquiries which does not fortify our convictions of the correctness of our impressions which the case, on its first aspect, produced on our minds, viz: that the act of compromise of 1820 created no servitude in favor of the plaintiffs' estates.

We made no reference, in our opinions, to the cases cited by the counsel, which were decided by Courts of Common Law and Chancery, because the question presented was one to be determined exclusively by our own Code and jurisprudence, and we have always made it a rule to preserve the titles to real property, and its modes and uses, in the simplicity in which the Code has created them, and not to introduce the complexities and refinements of an artificial and foreign jurisprudence.

But we do not think that under any system of jurisprudence which recognizes law as a science, the establishment of the servitude could be deduced from the titles of the plaintiffs.

We have been more and more impressed with the difficulty of reconciling the servitude claimed by the plaintiffs, with public policy.

The counsel has referred to the treatise of Mr. Sugden, on *Vendors*, 2 vol. 329, to establish the proposition that, in point of law, there is no objection to the owner of an area, surrounded by houses, contracting that it shall never be built upon. Such establishments are not uncommon in the cities and towns of the United States.

But is there no difference between the reservation of a space for the convenience of the occupants of dwelling houses in a city, which is to be of a permanent character, and is, in fact, necessary for the purposes to which the property is to be applied, and the right set up by the plaintiffs? The bank of the river, years ago, within the recollections of many, was squares distant from the present bank. The alluvion has been regularly making its formations *ab urbe condita*. A servitude of view, or of front, when Tchoupitoulas street was the street next the river, would condemn the intermediate property to remain unoccupied. The owners could appropriate it to none of the purposes for which its situation renders it useful. How are they to meet the burthens of taxation and the expenses and charges to which land in New Orleans is subjected, if they cannot derive profit from its use by improving it?

The whole front of the First District would, at the will of a few of the proprietors of lots, be virtually taken from the domain of property. As those changes in the river bank were inevitable, and to happen in the regular course of time, they were foreseen, and, in the absence of any convention establishing a servitude, Courts cannot be too cautious in impairing the use to which property, by its nature and position, is destined.

The leading case, referred to by the author on the doctrine laid down, has already been noticed by this Court. The case is that of *Keppel* v. *Bailey*, reported in 12 Chancery Reports, p. 120. The opinion of *Lord Brougham*, the Chancellor, was quoted by *Mr. Justice Rost* in the celebrated case of *Franklin's Succession*, 7th Annual Reports. Its application to the pretensions of the plaintiffs to stamp upon this extent of land, required by its position for the wants of trade and commerce, their useless and shadowy servitude is most apposite. "There can be no harm," says his lordship, "in allowing the fullest latitude to men in binding themselves and their representatives, that is, their assets, real and personal, to answer in damages for breach of their obligations. This tends to no mischief and is a reasonable liberty to bestow; but great detriment would arise and much confusion of rights, if parties were allowed to invent new modes of holding and enjoying real property, and to impress upon their lands and tenements a peculiar character which should follow them into all hands, however remote. Every close, every messuage, might thus be held in a several fashion, and it would hardly be possible to know what rights the acquisition of any parcel conferred, or what obligations it imposed."

The rehearing is, therefore, refused.