# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-1293


**EL PASO FIELD SERVICE, INC.**

**VERSUS**

**STEPHEN MINVIELLE**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NUMBER 99,069
HONORABLE PAUL J. DEMAHY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**BILLIE COLOMBARO WOODARD**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Billie Colombaro Woodard, Oswald A. Decuir, and Billy Howard Ezell, Judges.

**AFFIRMED.**


Jeffrey M. Baudier
Attorney at Law
500 Dover Boulevard, Suite 120
Lafayette, Louisiana 70503
(337) 406-5610
Counsel for Plaintiff/Appellee:
    El Paso Field Service, Inc.

John Felton Blackwell
Post Office Box 10051
New Iberia, Louisiana 70562-0051
(337) 367-8517
Counsel for Defendant/Appellant:
    Stephen Minvielle

WOODARD, Judge.

The Plaintiff, El Paso Field Services, Inc. (El Paso), sought an injunction prohibiting the Defendant, Mr. Stephen Minvielle, from engaging in any crawfishing operations on its right-of-way (ROW) that could damage its pipeline. We affirm the trial court's decision to grant it an injunction.

\* \* \* \* \*

On January 29, 2001, El Paso became the owner and operator of the Sibon Pipeline traversing Mr. Minvielle's property.

On September 15, 1959, his ancestor in title granted the Sibon Pipe Line Company, El Paso's ancestor in title, "the right to lay" this pipeline across the property. The ROW agreement also gave this company's "successors and assigns" a permanent right to "operate, maintain, inspect, repair, replace, change the size of, and remove" its pipeline.

On February 28, 1985, the parties' predecessors executed an amendment to this ROW agreement to designate with particularity the portion of the property encumbered:

> [T]he total width of the right-of-way acquired . . . is and shall be a width of fifty (50) feet, measured twenty-five (25) feet on either side of the center line of the pipeline as it is physically located in place on the captioned property.

In May of 2000, Mr. Minvielle constructed a crawfish pond on the subject property despite his awareness that a pipeline rightfully traversed it since 1959. Before beginning construction, he met with representatives of Enron, owner of the ROW at the time, to discuss the possible ramifications of building a crawfish pond over the Sibon Pipeline. Enron told him he could construct the pond only if he agreed that he would not change the volume of dirt over its pipeline, which it maintained at a thirty-six (36) inch minimum depth.

In February of 2001, Mr. Minvielle began conducting his crawfishing operation, using a sixteen (16) foot by six (6) foot wide hydraulically driven boat propelled by a steel wheel, commonly referred to as a "crawler," that floats along the contour of the

1

bottom of the pond. The crawler's wheel is approximately thirty-six (36) inches by eight (8) inches wide and has "cleats" protruding from it made out of "cold-roll steel" which provide traction for the crawler.

When he described his crawler for the trial court, Mr. Minvielle explained that: "It crawls along the bottom and . . . because it is quite heavy, it will sink through the mud-line, depending on how much it gets slurred up and all; and it will find solid earth to propel the boat along." Due to this mode of operation, the crawler causes significant rutting of the soil because its wheel has to dig deeper each time it passes through the pond's soft muddy bottom in order to propel the crawler forward, which results in the wheel going ever deeper below the surface of the soil as crawfish season progresses. In fact, Mr. Minvielle confirmed that sometimes the entire wheel goes below the soil digging a trench that can be upwards of forty (40) inches deep.

Approximately three months later, in late April, Mr. Minvielle's first crawfish season ended, and the pond was emptied until the following season began in November of 2001.

In January of 2002, his crawler struck the Sibon Pipeline while harvesting crawfish. The next day, he marked the area where he thought he hit the pipeline and called to report this incident to the company that owned the pipeline at the time. The representative who answered reportedly said that they would send someone to inspect the pipeline immediately.

According to Mr. Minvielle, it was "two, three, or four weeks later" before Mr. Daron Johnson, an Operations Specialist for El Paso, went to the property to perform a "routine inspection" of the pipeline. At trial, when Mr. Minvielle was asked whether Mr. Johnson knew that the crawler struck El Paso's pipeline, he responded: "No, he indicated that [El Paso] had just bought the [Sibon Pipeline] in January . . . and he had no knowledge of it." He was also asked about the steps Mr. Johnson took on that day to resolve this problem. Mr. Minvielle answered:

> I must say that Mr. Johnson reacted really quick. He did not play around with it.
>
> . . . .

2

He explained to me what was in there, what was going on . . . [and] asked me not to do this any more. [He also asked me] [t]o mark the spot where it was [struck] to the best of my ability and [told me] that he was going to contact his superiors above him and find out what they needed to do about this.

Two or three weeks later, "[a] barrage of engineers [and] right-of way people" came out to the property to talk with Mr. Minvielle about this incident. After a few meetings, El Paso agreed not to excavate the portions of the pipeline that he thought he hit until sometime after April of 2002, when the crawfish season had ended, because it realized that any work on the pipeline would interfere with his crawfishing operation. El Paso's agreement was contingent on Mr. Minvielle's promise to stay off their pipeline for the rest of the season.

On August 15, 2002, when it excavated the portions of the pipeline which Mr. Minvielle had previously marked, El Paso found only one spot where he had damaged the pipeline's "epoxy cold tar" protective coating, but it found no damage to the pipe, itself. At a second location, where he mistakenly believed he struck the pipeline, it found no damage to the pipe or its protective coating.

That same day, El Paso removed and replaced the damaged portion of the pipeline's coating. In addition, to lessen the likelihood of any future mishaps, it placed thirty stakes across his pond, marking the exact location where the pipeline crossed.

On September 5, 2002, Mr. Minvielle sent El Paso a letter asking it to move its pipeline to a sufficient depth to ensure that his crawler would not hit it again. In this letter, he asserted:

It is quite clear that the pipe is not submerged to an appropriate depth to allow me to fully use and enjoy the property, and that this problem definitely interferes with the cultivation of the land. El Paso was notified of this problem in January, 2002. However, no attempt to remedy the problem has occurred; it has taken until August 15, 2002 for El Paso to even investigate my complaints. Please be advised that I plan to flood this land to cultivate the fall crawfish crop. *I am certainly uncomfortable with El Paso ignoring such a dangerous and potentially life threatening situation*, which they have created in improperly maintaining this high-pressure LPG pipeline, and allowing it to remain in a position, which causes it to be struck because it is not properly submerged to an appropriate depth. . . . I want the pipeline submerged to an appropriate depth that will allow me to cultivate and harvest my

3

crawfish crop without striking the high-pressure LPG pipeline during my farming operations.

(Emphasis added.)

On September 9, 2002, El Paso filed an injunction, asking the trial court to order Mr. Minvielle to refrain from any operations that could cause the Sibon Pipeline to be struck, tampered with, or compromised in any fashion. In response, he filed an answer, alleging that it had breached the ROW agreement which required it to bury its pipeline deep enough so that it would not interfere with the cultivation of his land. He also reconvened for an injunction prohibiting El Paso from transmitting liquified petroleum gas or other hydrocarbons within its pipeline, or, in the alternative, he asserted that he was entitled to damages for its breach of the ROW agreement.

On June 5, 2003, following a trial on the merits, the trial court granted an injunction to El Paso. Its judgment reads:

> IT IS ORDERED AND DECREED that [Mr. Minvielle] be enjoined from operating his crawfishing harvesting vessel in any way so as to allow the vessel's wheel to come in contact with the soil within three (3) feet of either side of or on top of [El Paso's] Sibon Pipeline, except that [Mr. Minvielle] shall have the unrestricted right to cross over the pipeline at one location twenty (20) feet wide, where the Sibon Pipeline is buried the deepest beneath the surface.
>
> IT IS FURTHER ORDERED that all other relief requested by the parties be denied.
>
> IT IS FURTHER ORDERED that all costs be divided equally between the parties.

On appeal, Mr. Minvielle asserts that the trial court abused its discretion: (1) by granting an injunction when the ROW agreement permitted the actions he took on the ROW; (2) by granting an injunction when El Paso made no showing of irreparable harm or injury and when it had another adequate legal remedy; (3) by granting an injunction that did not prohibit an unlawful act, and by enforcing a right not granted to El Paso in the ROW agreement; (4) by granting an injunction when the scope of the injunction granted was inappropriate; (5) by granting an injunction when El Paso failed to prove that there was a reasonable probability that he would damage the pipeline in the future; and (6) by not assessing all costs to El Paso.

4

* * * * *

**INJUNCTION**

Mr. Minvielle's assignments of error all revolve around his assertion that the trial court erroneously granted El Paso injunctive relief. The trial court has great discretion to grant or deny injunctive relief; thus, we will not disturb its determination without proof that it manifestly abused its discretion.[1]

*The Right-of-Way Agreement*

Mr. Minvielle asserts that the trial court should have found El Paso in violation of the ROW agreement; instead, he believes it placed unlawful restrictions on his right to use and enjoy his property.

The grant of a ROW is "[a] predial servitude, which is a charge on a servient estate for the benefit of a dominant estate."[2] In this matter, the dominant estate, El Paso's ROW, benefits from the burden placed on Mr. Minvielle's property, the servient estate.[3]

A ROW is a conventional predial servitude, which means it is a predial servitude established by contract.[4] The title creating a ROW regulates its use and the extent to which it is used.[5] According to La.Civ.Code art. 730, any "[d]oubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." The comments to Article 730 provide, in pertinent part:

> (b) It is a cardinal rule of interpretation that, *in case of doubt, instruments purporting to establish predial servitudes are always interpreted in favor of the owner of the property to be affected. . . .* The rule that the proper interpretation of an ambiguous instrument is that which least restricts the ownership of the land has been applied by

---

[1]*See Robbins v. State ex rel. State Land Office*, 97-671 (La.App. 3 Cir. 12/17/97), 704 So.2d 961, *writ denied*, 98-176 (La. 3/20/98), 715 So.2d 1214.

[2]La.Civ.Code art. 646.

[3]*See Leblanc v. Trappey*, 02-1103 (La.App. 3 Cir. 2/5/03), 838 So.2d 860, *writs denied*, 03-651, 03-684, (La. 5/2/03), 842 So.2d 1107, 842 So.2d 1109.

[4]*Leblanc*, 838 So.2d 860.

[5]La.Civ.Code art. 697.

Louisiana courts in a variety of contexts. *See, e.g., Whitehall Oil Co. v. Heard*, 197 So.2d 672 (La.App. [3] Cir.), *writ* [*denied,*] 250 La. 924, 199 So.2d 923 (1967) (determination of the question whether a landowner created a single servitude over contiguous tracts or a series of multiple interests).

(c) "Servitudes claimed under titles, are never sustained by implication—*the title creating them must be express*, as to their nature and extent, as well as to the estate to which they are due." *Parish v. Municipality No. 2*, 8 La.Ann. 145, 147 (1853), cited with approval in *Buras Ice Factory, Inc. v. Department of Highways*, 235 La. 158, 103 So.2d 74 (1958).

(Emphasis added.) Thus, Article 730 mandates that the trial court interpret any ambiguity *in the instrument* creating a predial servitude in favor of the landowner, Mr. Minvielle.[6]

The ROW agreement clearly resolves any doubt as to the existence, extent, and manner in which El Paso was to use its ROW. Specifically, it grants El Paso the following rights:

[T]he right to lay, construct, operate, maintain, inspect, repair, replace, change the size of, and remove a pipeline, in whole or in part, for the transportation of gas, oil, petroleum, or any of their products, including any liquids or gases derived or manufactured therefrom hydrocarbons, water, and other substances and such equipment and appurtenances as may be necessary or incidental for such operations, including corrosion control equipment, the Grantee selecting the route, upon, over, and through the following described land . . . .

. . . .

The Grantee, at any and all reasonable times, shall have the right of ingress to and egress from such [pipeline] for all purposes of this grant.

TO HAVE AND TO HOLD the rights and privileges hereunder granted unto said SIBON PIPE LINE COMPANY, its successors and assigns so long as such pipelines, equipment, and appurtenances or any thereof, are maintained.

Grantor, his heirs and assigns shall at all times have the right to fully use and enjoy the said premises, except for the purposes granted to

---

[6]*See State v. Kitterlin Creek, L.L.C.*, 02-1063 (La.App. 3 Cir. 2/5/03), 838 So.2d 926, *writ denied*, 03-1111 (La. 6/6/03), 845 So.2d 1097.

6

the Grantee; provided however that Grantor shall not construct any house or structure on or over the Right-of-Way herein granted, without first obtaining written consent of Grantee. Grantee, its successors and assigns are hereby expressly given and granted the right to assign this Right-of-Way or easement or any part thereof.

However, the ROW agreement limits those rights El Paso acquired as follows:

By the acceptance hereof, *the Grantee agrees to bury such pipelines so that they will not interfere with the cultivation of the land* and also to pay any and all damages to crops, fences and land which may be suffered from the construction, operation, or maintenance of such [pipeline].

(Emphasis added.) Accordingly, Mr. Minvielle contends that El Paso breached the ROW agreement by not having its pipeline submerged to a sufficient depth, and, as a result, his crawler struck the pipeline. He asserts that this incident is evidence of El Paso's interference with his cultivation of crawfish; therefore, the trial court abused its discretion when it enjoined him from riding his crawler within three (3) feet of its pipeline.

In support of its determination, the trial court reasoned:

Based on the Right of Way agreement, Mr. Minvielle has the right to conduct an aquaculture operation within the Right of Way, and El Paso has the right to have its pipeline within the Right of Way, and neither can interfere with the other.

With regard to each of their requests for an injunction, I feel the appropriate remedy will be to grant an injunction to [El Paso], prohibiting Mr. Minvielle from operating his operation such that the wheel of his crawler would not come in contact with the soil at the bottom of the pond, within three feet of the pipeline, except at one crossing. . . .

I think that would protect the interests of both parties and avoid any damage to the pipeline and any other damage resulting.

Therefore, the trial court found that, under the ROW agreement, both parties were obligated not to interfere with the other's rights. Moreover, implicit in its reasoning is its belief that Mr. Minvielle was the only party who obstructed or disturbed real

7

rights in this property. However, before we can determine whether its assessment was just, we must identify Mr. Minvielle's obligations under the ROW agreement.

Louisiana Civil Code Article 651 provides:

> The owner of the servient estate is not required to do anything. His obligation is to abstain from doing something on his estate or to permit something to be done on it. He may be required by convention or by law to keep his estate in suitable condition for the exercise of the servitude due to the dominant estate.

Furthermore, the owner of the servient estate may do nothing that: (1) will diminish the use of the servitude or (2) makes the use of the servitude more inconvenient.[7] Therefore, Mr. Minvielle was obligated by law to abstain from activities that burdened or interfered with El Paso's ROW.

It is undisputed that he knew a pipeline ROW encumbered this property for more than forty years before he bought it. During that time, the previous owners of the property used it extensively for rice and sugar cane farming. Yet, Mr. Minvielle was the first person ever to damage the pipeline.

Mr. Mark Champagne, from Louisiana's Office of Pipeline Safety, testified that the Sibon Pipeline complies with current standards that require owners of pipelines to bury them at least thirty-six (36) inches deep. As such, it was inevitable that problems would arise when Mr. Minvielle started using his crawler to harvest crawfish when it had a thirty-six (36) inch wheel propelling it that would sometimes dig trenches forty (40) inches deep. Thus, his admission that he chose to harvest crawfish with a crawler even before construction on the pond began is particularly relevant since El Paso established at trial that this crawler was the only crawfish harvester on the market that caused significant rutting.

Nevertheless, before construction, he failed to inform Enron, a previous owner of the pipeline, that the harvester he chose was capable of digging forty (40) inches underground. It is also uncontested that he promised a representative of Enron, who was supervising the construction of the pond at the time, he would not take "any substance of any volume at all off the top of the pipeline." Furthermore, he admitted

---

[7]La.Civ.Code art. 748.

at trial that his striking of the pipeline interfered with El Paso's safe operation of the pipeline.

Under these particular circumstances, we find that Mr. Minvielle's crawfishing operation interfered with the rights granted to El Paso under the ROW agreement, whereas El Paso committed no such violation.

### *Irreparable Harm/Adequate Remedy*

Mr. Minvielle contends that the trial court's issuance of an injunction, when El Paso made no showing of irreparable harm or injury and when it had another adequate remedy at law, was improper.

Louisiana Code of Civil Procedure Article 3601 states, in part: "An injunction shall issue in cases where irreparable injury, loss or damage may otherwise result to the applicant, or in other cases specifically provided by law." In other words, irreparable loss or injury must immediately threaten the party seeking injunctive relief under this article, and that party must be without any other adequate legal remedy.[8]

However, La.Code Civ.P. art. 3663 authorizes the trial court to grant an injunction to protect a ROW if another obstructs or disturbs the ROW owner's possession or enjoyment of this real right in immovable property and if the ROW owner or their ancestors in title have had this ROW for more than a year.[9] When a party seeks an injunction on this ground, there is no need to make a showing of irreparable harm.[10] In addition, nothing in Article 3663 suggests the existence of a mandate requiring these parties to prove that the law does not offer them any other adequate remedy.

The trial court specifically addressed Mr. Minvielle's assertion that El Paso had another viable legal remedy:

> The argument has been made that if Mr. Minvielle were to rupture the pipeline, that any damage could be compensable, therefore an injunction is not an appropriate remedy.

---

[8]*Kinder v. Beauregard Electric Cooperative, Inc.*, 339 So.2d 891 (La. App. 3 Cir. 1976).

[9]*Red River v. Noles*, 406 So.2d 294 (La.App. 3 Cir. 1981).

[10]*Id.*

[W]hen that pipeline ruptures there is a potential of someone being killed. Technically, that is compensable in money, but I don't think that is what we should consider in deciding whether an injunction should be entered.

We agree. Therefore, El Paso needed to show, only, that Mr. Minvielle disturbed the rights granted to it under the ROW agreement to prove its entitlement to injunctive relief.

Given our previous finding that the crawler's striking of the pipeline constituted a disturbance or interference with El Paso's ROW, Mr. Minvielle's contention that the trial court erroneously granted this injunction without a showing of irreparable harm or injury is without merit. Likewise, his assertion that El Paso had another adequate legal remedy that prohibited it from receiving injunctive relief is also meritless.

*Prohibiting a Lawful Act/Enforcing a Right Not Granted*

Next, we address Mr. Minvielle's contention that the trial court granted: (1) an injunction that does not enforce a right granted to El Paso in the ROW agreement; and (2) an injunction that does not prohibit him from engaging in an unlawful activity.

Louisiana Civil Code Article 748 provides, in part: "The owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the servitude."

Accordingly, El Paso has the right to use its ROW without interruption. Thus, an injunction limiting the crawler's movement over the pipeline is a reasonable measure designed to ensure that the crawler will never again strike the pipeline given that any such collision would disturb El Paso's use of its pipeline because it would require more excavations to determine the extent of damage done to the pipeline.

As such, these assignments of error are clearly without merit when one considers that under La.Code Civ.P. art. 3663 a trial court can grant an injunction merely to prevent the owner of the servient estate (Mr. Minvielle) from diminishing or making the exercise of the rights granted to the owner of the dominant estate (El Paso) under a ROW agreement more inconvenient. Therefore, it could grant this relief even though the prohibited activity (use of the crawler within three (3) feet of the

10

pipeline) was not an unlawful act, since it found that any such use would interfere with El Paso's use of the ROW.

Therefore, these two assignments of error have no merit.

*Scope of the Injunction*

Mr. Minvielle also argues that it was an abuse of discretion for the trial court to prohibit him from operating his crawler within three (3) feet of the pipeline, rather than some narrower protective zone.

An injunction is an equitable remedy that the trial court should carefully design to achieve the essential correction at the least possible cost and inconvenience to the defendant.[11]

The testimony at trial proved that the crawler's wheel was three (3) feet in diameter. Thus, the trial court could have logically concluded that a three (3) feet buffer zone would give Mr. Minvielle enough room to turn his vehicle without traversing the pipeline. Also, Mr. Minvielle's suggestion that it could have more adequately protected the pipeline by making El Paso bury it deeper belies his own testimony depicting the way in which his crawler operates. Specifically, he testified that the crawler "crawls along the bottom and . . . because it is quite heavy, it will sink through the mud-line, depending on how much it gets slurred up and all; and it will find solid earth to propel the boat along." The evidence presented at trial also confirmed that his crawler was the only harvester on the market that caused significant rutting of the soil because its wheel digs deeper each time it passes through a pond's soft muddy bottom, which causes the wheel to go ever deeper below the surface of the soil as crawfish season progresses. Therefore, given the crawler's tendency to dig trenches consecutively deeper as time goes on, there is no guarantee that lowering the pipeline would prevent it from eventually digging deep enough to strike it again.

In light of the facts presented, we find that the scope of the injunction granted to El Paso was reasonable and was not overly broad.

---

[11]*Hilliard v. Shuff*, 256 So.2d 127 (1971).

11

*Likelihood of Future Damages*

In his fifth assignment of error, Mr. Minvielle argues that the injunction was improper since El Paso did not prove that there was a reasonable certainty that he would strike the pipeline again in the future.

The trial court cannot use an injunction to correct an already consummated wrong because it is meant only to prevent a wrong.[12]  Therefore, injunctive relief is not available when the party who seeks it does not establish that the other party is likely to commit the acts he seeks to enjoin.[13]

It is clear from the record, however, that the very manner in which Mr. Minvielle's crawler operates ensures that if its movement were left unchecked, it would likely create more ruts deep enough to allow it to compromise the pipeline again in the future.  Consequently, the trial court did not abuse its discretion when it determined that future damage to the Sibon Pipeline was possible if it did not restrict his use of the crawler.

*Assessment of Court Costs*

In his final assignment of error, Mr. Minvielle asserts that the trial court erred by dividing the court costs evenly between the parties.

We find no merit in this assignment of error.

## CONCLUSION

The trial court did not abuse its vast discretion when it granted injunctive relief to El Paso.  Thus, we affirm and assess all costs of this appeal to Mr. Minvielle.

**AFFIRMED.**

---

[12]*Robbins*, 704 So.2d 96.

[13]*Humble Oil & Refining Co. v. Harang*, 262 F. Supp. 39 (E.D. La. 1966).